1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8
9  Donald Ray Palmer,                          )    No. CV 11-0199-TUC-AWT (DTF)
                                               )
10            Petitioner,                       )    **REPORT AND RECOMMENDATION**
                                               )
11  vs.                                         )
                                               )
12                                              )
    Charles L. Ryan; et. al.,                  )
13                                              )
              Respondents.                      )
14                                              )
                                               )
15  _____  )

16            Petitioner Donald Ray Palmer has filed a Petition for Writ of Habeas Corpus pursuant

17  to 28 U.S.C. § 2254. (Doc. 1.) Respondents have filed an Answer (Doc. 14) and Petitioner

18  has filed a Reply (Doc. 16).  In accordance with the Rules of Practice of the Court, this

19  matter was referred to the undersigned Magistrate Judge for a Report and Recommendation.

20  The Magistrate Judge recommends that the District Court, after its independent review of the

21  record, deny and dismiss the Petition for Writ of Habeas Corpus.

22                        **FACTUAL & PROCEDURAL BACKGROUND**

23            Petitioner was convicted in the Pima County Superior Court of attempted first-degree

24  murder, drive-by shooting, and aggravated assault regarding an incident involving his former

25  girlfriend on December 18, 2004. (Doc. 14, Ex. F.)[1]  Petitioner was sentenced on April 9,

26  _____

27            [1] Relevant portions of the state court record are attached as Exhibits A through MM
    to Respondents' Answer. (Doc. 14.)  The Court cites to the state court record by exhibit
28  number without the corresponding docket number assigned to Respondents' Answer.

2007, to life imprisonment without the possibility of release for 25 years.  (Ex. A.)  Petitioner appealed and the Arizona Court of Appeals affirmed his conviction and sentence. (Exs. B-F.)

In February 2009, Petitioner, represented by counsel, filed a Rule 32 petition asserting several grounds.  (Ex. K.)  Petitioner and his attorney moved to strike the counseled Rule 32 petition because Petitioner desired to proceed pro se.  (Ex. L.)  The PCR court denied the motions to strike but allowed Petitioner to file an amended or supplemental post-conviction petition. (Ex. M.) Petitioner pro se filed a supplemental petition asserting numerous grounds for relief. (Ex. N.)  The PCR court, in December 2009, denied Petitioner's counseled petition and his pro se supplemental petition.  (Ex. P.)  Petitioner moved for reconsideration which the court denied.  (Exs. Q, R.)   Petitioner pro se filed a petition for review in the Arizona Court of Appeals in which he raised all of the claims he had asserted in his supplemental petition. (Exs. S, T.)  On June 25, 2010, the state appellate court granted review, adopted the trial court's ruling, and denied relief on all claims.  (Ex. U.)  Petitioner's request for review in the Arizona Supreme Court was denied on December 6, 2010.  (Exs. V, W.)

## LEGAL STANDARDS FOR RELIEF UNDER THE AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d).  The last relevant state court decision is the last reasoned state decision

regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.

Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664

(9th Cir. 2005).

"The threshold test under AEDPA is whether [the petitioner] seeks to apply a rule of

law that was clearly established at the time his state-court conviction became final."

*Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

(d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

of the holdings of the Supreme Court at the time the petitioner's state court conviction

became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

The Court has explained that a state court decision is "contrary to" the Supreme Court's

clearly established precedents if the decision applies a rule that contradicts the governing law

set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

Supreme Court on a matter of law, or if it confronts a set of facts that is materially

indistinguishable from a decision of the Supreme Court but reaches a different result.

*Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

characterizing the claims subject to analysis under the "contrary to" prong, the Court has

observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

clause."  *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir.

2004).

Under the "unreasonable application" prong of  § 2254(d)(1), a federal habeas court

may grant relief where a state court "identifies the correct governing legal rule from [the

Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

1   "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

2   where it should not apply or unreasonably refuses to extend the principle to a new context

3   where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

4   application of Supreme Court precedent "unreasonable," the petitioner must show that the

5   state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."

6   *Id*. at 409; *Landrigan*, 550 U.S. at 473; *Visciotti*, 537 U.S. at 25.   "A state court's

7   determination that a claim lacks merit precludes federal habeas relief so long as '"fairminded

8   jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

9   131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

10   Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

11   court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*,

12   545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

13   determination will not be overturned on factual grounds unless objectively unreasonable in

14   light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S.

15   322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In

16   considering a challenge under § 2254(d)(2), state court factual determinations are presumed

17   to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

18   convincing evidence." 28 U.S.C. § 2254(e) (1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*,

19   545 U.S. at 240.

20   **MERITS ANALYSIS**

21   Petitioner asserts eleven claims for relief in his federal habeas petition.  Respondents

22   do not dispute the timeliness of the petition and concede the claims are exhausted.  (Doc. 14

23   at 8.)  Respondents contend, however, that the Petition must be denied on the merits.

24   ***Claims One-Four:  Prosecutorial Misconduct***

25   Petitioner contends in Claims One through Four that he is entitled to a new trial based

26   on the State's knowing presentation of false testimony at his criminal trial, resulting in a

27   violation of due process.  The state PCR court did not discuss the merits of these federal

28   claims; rather, the court denied the claims by finding that they did not meet the newly

1    discovered evidence exception to preclusion under Arizona Rule of Criminal Procedure

2    32.1(e).  (Ex. P at 7-10.)

3           Petitioner clarified in his Reply brief before this Court that he is asserting prosecutorial

4    misconduct. (Doc. 16 at 3-4.)  Because the state court's analysis is based on newly discovered

5    evidence under state rule, there is no reasoned state court decision on the federal prosecutorial

6    misconduct claims.    However, this Court must presume that the federal claims were

7    adjudicated on the merits when the state court denied them, and Petitioner has offered no

8    rebuttal of that premise.  *See Johnson v. Williams*, 133 S. Ct. 1088 (2013) (applying a

9    rebuttable presumption).  When there is no reasoned state court decision, the federal court

10   performs "an independent review of the record to ascertain whether the state court decision

11   was objectively reasonable."  *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).

12   Independent review is not the equivalent of de novo review but "is a style of review which

13   views the state court decision through the objectively reasonable lens." *Allen v. Ornoski*, 435

14   F.3d 946, 955 (9th Cir. 2006).  Although the federal habeas court independently reviews the

15   record, it must "still defer to the state court's ultimate decision."  *Id*. (quoting *Pirtle v.

16   Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002)).

17          A conviction obtained by the knowing use of false evidence violates due process and

18   must be set aside if there is any reasonable likelihood that the false evidence could have

19   affected "the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 269-71 (1959); *see also*

20   *United States v. Agurs*, 427 U.S. 97, 103 (1976).  To prevail on a *Napue* claim, the petitioner

21   must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew

22   or should have known that the testimony was actually false, and (3) that the false testimony

23   was material."   *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).   The

24   "touchstone of materiality" is a "reasonable probability" of a different result.  *Kyles v.

25   Whitley*, 514 U.S. 419, 434-35 (1955).  The impact of alleged perjured evidence "must be

26   evaluated in the context of the entire record." *Agurs*, 427 U.S. at 112.

27

28

*Claims One and Two: Identification Testimony*

Petitioner contends in Claims One and Two that the state prosecutor knowingly presented false testimony from the victim at the criminal trial regarding Petitioner's identification and the identification of his vehicle. (Doc. 1 at 6, 7.) Petitioner contends that the victim admitted, in a civil trial held after his criminal trial, that she did not see her attacker's face and she could not positively identify the vehicle involved in the attack.

At Petitioner's criminal trial on March 7, 2007, the victim testified that on the day of the shooting incident, she left a hotel (in the vicinity of the airport on Tucson Boulevard) where she had been with her boyfriend and called Petitioner on her cell phone at about 5:54 a.m. (Ex. X at 89, 101.) When she pulled onto the street, Petitioner told her over the phone to look in her rearview mirror. (*Id*. at 102.) She testified that when she looked back she saw Petitioner behind her, that she recognized his vehicle which she described as a teal Chrysler, and that he drove behind her for a while. (*Id*. at 102-03.) She looked over and saw Petitioner driving beside her, testifying there was no doubt in her mind that Petitioner was in the car. (*Id*. at 103.) After glancing toward Petitioner a few times as she was driving, the victim noticed he had a gun in his hand and heard a loud "bang." (*Id*.) The victim lost control of her vehicle, hit the curb, and crashed into a telephone pole. (*Id*. at 103-04.) The victim removed her seat belt and went down toward the floorboard to look for her cell phone, not realizing that her left hand had been grazed by the bullet. (*Id*. at 104-05.) Upon realizing that Petitioner had left his car and come over to her car, the victim positioned herself on the driver's side floorboard and covered her face as Petitioner continued shooting at her. (*Id*. at 105.) After Petitioner finished shooting, the victim opened the door of her car and got out onto the ground. Petitioner picked up her hand, said "fuck her," and left. (*Id*.) The victim told bystanders who came to her aid that it was Petitioner who shot her. (*Id*. at 106.) The victim reiterated that she had no doubt that Petitioner was the person standing on the side of her car shooting her. (*Id*. at 105.)

At the civil trial on April 30, 2008, the victim was cross-examined by Petitioner who represented himself in the matter. She testified that she was positive that the vehicle she saw

was Petitioner's car and that she may have said she thought it was a Chrysler because she was "not real good with the names of cars."  (Ex. JJ at 25-26.)  She described the car as teal colored, she did not know if it was two- or four-door, but she said she knew it was Petitioner's car. (*Id*. at 27-28.)  Upon further questioning, the victim answered "no" when asked if there was a possibility she might be wrong about the car, but then answered "I guess it could be a possibility." (*Id*. at 31-32.)  The victim testified that she recognized Petitioner when he told her to look in her rearview mirror and that she saw his silhouette or image.  (*Id*. at 32-33.) The victim testified that she saw Petitioner get out of his car, run toward her vehicle to the driver-side window and start shooting, and that she saw him again when he picked up her hand. (*Id*. at 42-44, 45, 49-51.)  In later questioning, the victim testified that she was sure of her identification of Petitioner because they were on the phone together when he told her to look in her rearview mirror, although she did not see him clearly because it was dark.  (*Id*. at 97-98.)  She testified that she saw Petitioner when he jumped out of his car but she did not see Petitioner's face when he walked up to the car although she knew it was him from his body structure. (*Id*. at 100-01.)  The victim testified that she knew it was Petitioner's car because she previously had seen him driving it and had been in the car herself. (*Id*. at 98.)

The PCR court found that the victim's testimony at the later civil trial was not substantially different from her testimony at Petitioner's criminal trial.  The victim's later testimony did not exist at the time of the criminal trial and, therefore, was not newly discovered evidence.  (Ex. P at 7; Ex. R at 1.)

Based on a review of the records from both proceedings, the Court finds that the victim's testimony at the civil trial was not substantially different from her testimony at the criminal trial.  Petitioner has not shown that the victim gave false testimony, the prosecutor should have known of any material inconsistencies in the victim's statements at the time of his criminal trial, or the inconsistencies were material.  The state court's resolution of Claims One and Two was not objectively unreasonable.

1      *Claim Three: The Victim's Testimony About Injuries*

2          Petitioner contends that the prosecutor knowingly elicited false evidence about the

3      victim's injuries, resulting in a denial of due process.  (Doc. 1 at 8.)  Petitioner cites the

4      victim's testimony at the criminal trial that she was shot in the face and the bullet came out

5      the back of her neck.  (*Id*., referring to Ex. X at 108.)  Petitioner contends this was false

6      testimony because a medical report indicated there were "no lacerations, exit holes or trauma

7      to [the victim's] forehead, scalp, posterior neck or mastoid regions."  (Doc. 1 at 8-C, referring

8      to Ex. N; *see also* Ex. KK.)  Petitioner also refers to the victim's testimony at the later civil

9      trial that she was not sure that the mark on her neck was a bullet wound.  (Doc. 1 at 8-B,

10     referring to Ex. JJ at 77-80.)

11         The victim testified at the criminal trial that she was shot in the face, wrist and elbow.

12     (Ex. X at 107.)  After pointing to the location of the face wound, the victim testified that "the

13     bullet went in here and it came out of my neck back here somewhere."  (*Id*. at 108.)  A

14     bystander who arrived at the scene testified that he observed an exit wound on the back of the

15     victim's neck, he applied pressure to the area but the bleeding did not stop, and he then put

16     a brace on the victim's neck.  (Ex. X at 183-89.)  A police officer testified that he observed

17     someone applying pressure to the victim's neck and most of the blood was coming from that

18     area. (Ex. X at 51.)  The victim testified at the civil trial that there was a band-aid on her neck

19     for a long time and there was a mark on her neck, but she was not sure if it was a bullet

20     wound.  (Ex. JJ at 77-80.)

21         The PCR court rejected this claim, finding there was no evidence the prosecutor had

22     knowingly presented false evidence, there was evidence that the victim had been shot in the

23     face, Petitioner had not explained how the exit wound cast any doubt on the identity of the

24     shooter, and the issue was not relevant or newly discovered.  (Ex. P at 8; Ex. R at 1.)

25         Petitioner has not established the accuracy of the unauthenticated medical report on

26     which he relies.  Even if the victim did not sustain an exit wound to her neck, any

27     inconsistencies between the victim's testimony at the criminal trial and her testimony at the

28     civil trial can be attributed to mistake, not to the prosecutor's knowing presentation of false

testimony.  As the state court found, evidence that the victim may not have sustained an exit wound to her neck did not diminish the undisputed evidence that she was shot in the face, wrist and elbow, or affect the jury's verdict that Petitioner was the attacker.  Thus, any discrepancy is not material.  The state court's disposition of this claim was not objectively unreasonable.  Petitioner's Claim Three is rejected on the merits.

*Claim Four:  The Detective's Testimony About the Telephone Call*

Petitioner contends the State prosecutor knowingly elicited false testimony from Tucson police Detective Edwin Richards that the victim told him she had initiated the cell phone call to Petitioner on the day of the incident.[2]  (Doc. 1 at 9.)  Petitioner contends that the victim previously told the police that Petitioner had called her.  (*Id*.)

The victim testified at the criminal trial that during the early morning hours of December 18, 2004, she received numerous calls on her cell phone from Petitioner.  (Ex. X at 97-99.)  The victim decided to leave the hotel to check on her children when Petitioner told her over the phone that she better leave or someone in her family would get hurt.  (*Id*. at 100.) The victim testified that she called Petitioner on her cell phone to let him know she was leaving the hotel, acknowledging that her cell phone records showed that the call was made at 5:54 a.m. (*Id*. at 101.)  When cross-examined by defense counsel, the victim testified that in her statements to Detective Richards she had said that she did not initiate the call to Petitioner.  (*Id*. at 127-38.)  Detective Richards testified on cross-examination that during an interview on January 4, 2005, the victim had initially denied calling Petitioner but later admitted that she did make the call when shown her cell phone records.  (*Id*. at 225-26.)  On redirect examination by the prosecutor, Detective Richards was shown a portion of the interview transcript and testified as follows:

> Q.  And what she said starting at line 27, was it not, is "I pulled out and he was following me and he told me to look in your rearview mirror."  Is that right?

---

[2] In his Reply, Petitioner agrees with Respondents that this claim is difficult to understand and states that he "will drop this claim."  (Doc. 16 at 10.)  Because the claim has been exhausted and fully briefed, the Court addresses it on the merits.

A.      Yes, sir.

Q.      At no time did she say there who initiated that call, did she?

A.      No, she didn't.

Q.      Now, isn't it correct, Detective, that you basically assumed that it was [Petitioner] that called her?

A.      Yeah, pretty much.

(Ex. X at 227-28.)  A portion of the transcript of the detective's interview with the victim is included in the habeas record.  (Ex. LL.)  The PCR court found that, although there was "some ambiguity" in the detective's testimony, there was no false testimony, and Petitioner had not shown there was a reasonable probability that the result of the proceeding would have been different.  (Ex. P at 9; Ex. R at 2.)

The record does not support Petitioner's claim that the prosecutor elicited false testimony from Detective Richards.  Defense counsel cross-examined the victim and the detective about the victim's statements during the interview regarding who had initiated the phone call.  The jury was not left with a false impression about the victim's prior statements to the detective.  Any inconsistencies in the testimony of the two witnesses was not material as it was not relevant to the jury's determination that Petitioner was the attacker.  Petitioner has not shown that any alleged false testimony affected the outcome of the trial.  The state court's denial of Claim Four was not objectively unreasonable.

### Claim Five: The Suppression of Allegedly Exculpatory Evidence

Petitioner contends that the prosecutor suppressed evidence favorable to the defense in violation of due process, in that the State failed to disclose prior to trial that the victim claimed her wallet had been taken from her vehicle after the attack.  (Doc. 1 at 10; *see* Ex. MM.)  Petitioner asserts that evidence regarding the wallet would have provided a theory of defense because fingerprints left on the door of the victim's car were not his and he could have argued that the fingerprints were left by the attacker when he leaned in to get the wallet.  (Doc. 1 at 10-A, 10-B.)  Respondents contend that the State could not suppress something about which it had no knowledge and the wallet is not material evidence.  (Doc. 14 at 17.)

1    The State presented evidence at trial that the police found fingerprints on the exterior

2    of the driver's door of the victim's vehicle that were not matched to Petitioner or anyone else.

3    (Ex. EE at 86-89, 100-05.)  Defense counsel argued there was no physical evidence, such as

4    fingerprints or DNA, that linked Petitioner to the crimes and that the natural motion of the

5    shooter would have been to lean against the vehicle.  (*Id*. at 140.)  Prior to sentencing, the

6    victim completed a restitution worksheet, which listed the wallet as an item taken.  (Ex. MM.)

7    The victim testified during the civil trial that she listed items on the restitution sheet

8    as "missing," further stating, "I just listed things – and not to say that you [Petitioner] took

9    them, but, I mean, I just wrote them down." (Ex. JJ at 66.)  The victim testified that she knew

10   she had her wallet in the car before the crime and afterwards it was not there, "[b]ut I know

11   you [Petitioner] did not take it." (*Id*.)  She further testified that she did not think she had been

12   asked about the wallet during the criminal trial.  (*Id*. at 67.)

13   Petitioner raised this claim in his supplemental PCR petition.  (Ex. N at 19.)  The PCR

14   court resolved this claim by noting that the victim testified at the civil trial that the wallet was

15   lost as a result of the incident but that she did not claim that it was taken by Petitioner during

16   the assault.  (Ex. P at 8.).  The state court found that the victim's restitution affidavit was

17   irrelevant and not newly discovered evidence.  (*Id*.; Ex. R at 2.)

18   The prosecution's suppression of evidence favorable to the accused upon request

19   violates due process where the evidence is material either to guilt or punishment regardless

20   of the prosecution's good or bad faith.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To

21   establish a *Brady* violation, the defendant must show that the evidence is favorable to the

22   accused either as exculpatory or impeaching, that the evidence was suppressed by the

23   prosecution either willfully or inadvertently, and resulting prejudice has occurred.  *Strickler*

24   *v. Greene*, 527 U.S. 263, 281-82 (1999).  "[E]vidence is material 'if there is a reasonable

25   probability that, had the evidence been disclosed to the defense, the result of the proceeding

26   would have been different.'"  *Id*.  at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682

27   (1985)).  "A 'reasonable probability' is a probability sufficient to undermine confidence in

28   the outcome."  *Bagley*, 473 U.S. at 682.

1    The record does not show that the prosecutor knew prior to trial about the victim's

2    claim that her wallet had been taken from her vehicle.  In fact, Petitioner alleges the victim

3    completed the restitution sheet after trial.  (Doc. 1 at 20.)  In any event, Petitioner has not

4    shown that information about the missing wallet would have materially added to his defense.

5    The potentially relevant and exculpatory information was the evidence of the unmatched

6    fingerprints which was disclosed by the State and argued by defense counsel as indicating that

7    Petitioner was not the shooter.  Further, Petitioner elicited testimony from a bystander at the

8    scene who saw the shooter's vehicle and described it as a small compact car (Ex. X at 179),

9    which did not match Petitioner's car.  Failure to disclose evidence of the missing wallet so

10   Petitioner could further develop a robbery motive for the shooting did not deprive Petitioner

11   of a fair trial.  The trial evidence showed that the victim's backpack was in her vehicle's back

12   cargo area when the vehicle was towed to the police station and impounded after the shooting.

13   (Ex. X at 195.)  Petitioner has not shown there is a reasonable probability that the outcome

14   of the trial would have been different had Petitioner and defense counsel known about the

15   missing wallet.  Denial of this claim was not objectively unreasonable. Claim Five should be

16   rejected.

17       ***Claims Six Through Eleven: Ineffective Assistance of Counsel***

18       Ineffective assistance of counsel (IAC) claims are governed by *Strickland v.*

19   *Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner must show that

20   counsel's representation fell below an objective standard of reasonableness and that the

21   deficiency prejudiced the defense.  *Id*. at 687-88.

22       The inquiry under *Strickland* is highly deferential, and "every effort [must] be made

23   to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

24   challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*.

25   at 689.  Thus, to satisfy *Strickland's* first prong, deficient performance, a defendant must

26   overcome "the presumption that, under the circumstances, the challenged action might be

27   considered sound trial strategy."  *Id*.

28       Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court

1    "need not determine whether counsel's performance was deficient before examining the

2    prejudice suffered by the defendant as a result of the alleged deficiencies." *Id*. at 697 ("if it

3    is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice

4    . . . that course should be followed"). A petitioner must affirmatively prove prejudice. *Id*. at

5    693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but

6    for counsel's unprofessional errors, the result of the proceeding would have been different.

7    A reasonable probability is a probability sufficient to undermine confidence in the outcome."

8    *Id*. at 694. Petitioner bears the burden of showing the state court applied *Strickland* to the

9    facts of his case in an objectively unreasonable manner. *See Bell v. Cone,* 535 U.S. 685, 698-

10    99 (2002).

11               *Claim Six: Counsel's Alleged Failure to Investigate or Call Alibi Witnesses*

12        Petitioner contends trial counsel was ineffective in failing to investigate or call at trial

13    two potential alibi witnesses. (Doc. 1 at 11.) One witness was Petitioner's son who told a

14    police detective that Petitioner had left his car and picked up a truck from the son's workplace

15    around 6:00 to 6:15 a.m. (*Id*.; *see* Ex. Y at 3.) The other witness was Lawanda Grigsby, who

16    stated in an affidavit that Petitioner had been at her house between 6:00 and 6:05 a.m. on the

17    morning of the attack. (Doc. 1 at 11; *see* Ex. Y at 4.) This woman reported that she had

18    mentioned this information to Petitioner's defense counsel but had never heard back from

19    counsel. (Ex. Y at 4.) The record shows that the State disclosed the son's statement to defense

20    counsel on March 29, 2005, and that defense counsel contacted the woman who claimed

21    Petitioner was at her house on the morning of the crime. (Ex. Y.)

22        Petitioner called as a defense witness at trial his daughter Tamara, who was 22 years-

23    of-age at the time of trial. Tamara testified that Petitioner, in person, woke her up at their

24    home on 28th Street around 6:00 or 6:05 a.m. on December 18, 2004. (Ex. EE at 62-64.)

25    Tamara testified that Petitioner told her he was going to get a truck to do yard work, and he

26    was gone at 6:05 a.m. when she got out of bed. (*Id*. at 64-65.) She testified that it would take

27    about fifteen minutes to drive from the airport to the house she shared with her father. (*Id*.

28    at 65.) As previously discussed, the victim's cell phone records showed that she called

1   Petitioner at 5:54 a.m. on the day of the attack. The trial evidence showed that the 911 call
2   about the incident was placed at approximately 6:00 a.m. and that police officers arrived at
3   the scene at around 6:10 a.m. (Ex. X at 46, 48, 162.)

4          The PCR court ruled that counsel's decision regarding alibi witnesses was a matter of
5   trial strategy, stating that "neither of the witness' statements, even if they appeared reliable
6   and credible to [defense counsel] would preclude [Petitioner] from having been present at the
7   scene of the crime before 6 A.M." (Ex. P at 4.) It also noted that the son's statement was
8   consistent with Petitioner "switching vehicles soon after the shooting" and possibly
9   "demonstrated a guilty mind set." (*Id*.) The PCR court ruled on reconsideration that defense
10  counsel was not obligated to call all such alibi witnesses at trial. (Ex. R at 2.)

11         Petitioner has not shown that defense counsel failed to investigate the two potential
12  witnesses or how he would have benefitted from additional investigation. Further, Petitioner
13  was not prejudiced by counsel's failure to call them as defense witnesses at trial. As the PCR
14  court found, the son's statement may have been prejudicial to Petitioner because it possibly
15  concerned the car that the victim testified Petitioner was driving at the time of the attack.
16  Further, defense counsel presented a witness who testified as to Petitioner's whereabouts
17  during the early morning hours on the date of the incident.[3] The statements by the other "alibi
18  witnesses" were potentially conflicting as each witness put Petitioner at a different location
19  within approximately the same time frame as the incident. The state court's rejection of
20  Claim Six was not objectively unreasonable.

21

22  ───────────────

23         [3] Tamara testified that she did not see Petitioner again that day, and he disappeared
    for at least two months. (Ex. EE at 63-64, 76-77, 79.) She further testified that Petitioner's
24  girlfriend Kim came to the house on December 18 and gathered up some of Petitioner's
    clothing in a laundry bag. (*Id*. at 77-79.) The police did not locate Petitioner at his
25  workplace, his home, or his mother's home. (Ex. X at 214-18.) On about February 16, 2005,
    the victim notified the police that Petitioner was attempting to refinance the home they
26  owned together. (*Id*. at 110, 113, 219-20.) The police located Petitioner in Atlanta, Georgia,
27  where he had a sister, and he was arrested on February 18, 2005. (*Id*. at 219-20.)

28

1    *Claim Seven: Impeachment of Victim Regarding her Description of Petitioner's Car*

2    Petitioner contends trial counsel was ineffective because he did not impeach the victim

3    with her pretrial statements to the police that she had difficulty describing his vehicle.  (Doc.

4    1 at 12.)  When interviewed by the police prior to trial, the victim described Petitioner as

5    being in a "green" or "teal colored . . . luxury car," stating "I'm so bad with cars"; . . . "it's

6    a Chrysler.  Is it a Chrysler?" with "really nice" rims but unsure about whether the rims were

7    gold or silver or if the car was two- or four-door.  (Ex. AA.)  During trial, the victim testified

8    that she recognized the car traveling behind her when she was on the phone with Petitioner

9    as "his teal Chrysler."  (Ex. X at 102.)  Petitioner refers to these statements in his petition.

10   Petitioner presented this claim in his supplemental PCR petition.  (Ex. N at 25.)  The

11   PCR court rejected the claim, finding that "the victim's prior statements to detectives are not

12   inconsistent with her testimony at trial" and that Petitioner had no colorable claim that counsel

13   was deficient in his performance regarding her testimony.  (Ex. P at 6; Ex. R at 1.)

14   This Court finds the victim's pretrial statements and her trial testimony were not

15   significantly different or inconsistent.  The victim consistently described the car as a green

16   or teal-colored Chrysler.  Defense counsel's decision not to impeach the victim on this issue

17   was a sound trial strategy as it would have been on a minor or trivial matter.  *Campbell v.*

18   *United States*, 364 F.3d 727, 735 (6th Cir. 2004) (counsel's failure to impeach a witness on

19   minor inconsistencies in their testimony did not amount to ineffective assistance of counsel).

20   The state court's denial of this claim was not objectively unreasonable.

21   *Claim Eight: Counsel's Alleged Failure to Investigate or Present an Available Witness*

22   Petitioner contends that trial counsel failed to investigate whether a defense witness

23   who was in the military was available to testify in person before advising Petitioner to consent

24   to a videotaped deposition of the witness's testimony to be used at trial.  (Doc. 1 at 13.)

25   The trial court permitted the parties to take and use at trial the deposition of serviceman

26   Carl Perry, who was stationed in New Orleans and scheduled shortly to be deployed overseas.

27   (Ex. N at 28; Ex. DD.)  During opening statements, defense counsel told the jury that it would

28   see Perry on videotape because he was in Iraq.  (Ex. X at 36-37.)  It was noted that Petitioner

- 15 -

1   had not been present when Perry's video deposition was taken. (*Id*. at 51.) Petitioner stated

2   on the record that he had no objection to the recorded testimony. (Ex. EE at 50-54.)  After

3   the videotape was played in open court, the jury told the bailiff that at least one of them could

4   not hear the videotape very well. (Ex. EE at 58.)[4] The trial court and the parties agreed that

5   the videotape would be made available to the jury to hear one time during its deliberations if

6   they so chose. (*Id*. at 58-60.)  The court instructed the jurors of that decision. (*Id*. at 168.)

7   The jury did not re-watch the video. (Ex. II.)

8       With his supplemental post-conviction petition, Petitioner provided an affidavit from

9   a private investigator who stated that Perry had not deployed overseas until August or

10  September 2007, a few months after Petitioner's March 2007 trial. (Ex. N at 28; Ex. FF.) The

11  PCR court rejected the claim, finding that the witness would still have been unavailable within

12  the meaning of Arizona Rule of Evidence 804(a) allowing for the admission of prior

13  testimony of an unavailable witness because he was out-of-state. (Ex. P at 9-10; Ex. R at 2.)

14      Petitioner contends that the State should have investigated whether Perry was available

15  to testify in person (Doc. 1 at 13-B, 13-C; Doc. 16 at 18-19), but the record shows that both

16  parties agreed that Perry could testify by prerecorded video.  Petitioner has not shown that

17  defense counsel, at the time of trial, had information indicating the witness was available to

18  testify.  Nor has Petitioner shown by affidavit of the witness that he was in fact available to

19  testify in person at the time of trial.

20      Petitioner contends that his rights under the Confrontation Clause were violated, but

21  the record shows that Perry was called by the defense on Petitioner's behalf. (Doc. 1 at 13-C;

22  Ex. EE at 57.) The Confrontation Clause of the Sixth Amendment provides that, in a criminal

23  case, the accused has the right to "be confronted with the witnesses against him."  Petitioner

24  has not shown that Perry was a "witness against him" or that he was precluded from

25  questioning Perry on any subject relevant to his defense.

26

27      [4] The state court record on file does not appear to contain Perry's testimony. (Ex. EE

28  at 57-58.)

With respect to prejudice, Petitioner contends it must be presumed. This falls short of establishing actual prejudice as required by *Strickland*. Petitioner suggests that his defense was compromised because the jury could not hear parts of Perry's video testimony. However, the video recording was made available to the jury for a one-time viewing during their deliberations. Petitioner has not shown that counsel's alleged error in failing to obtain Perry's live testimony, as opposed to his videotaped testimony, prejudiced him to the point that there is a reasonable probability that the outcome of the trial would have been different. The state court's denial of this claim was not objectively unreasonable.

*Claim Nine: The Admission of Photographs of Petitioner's Car*

Petitioner contends that counsel was ineffective because he agreed to the admission of photographs of Petitioner's car which Petitioner argues were obtained in violation of the Fourth Amendment. (Doc. 1 at 14.) On June 19, 2006, the trial court held a hearing on Petitioner's motion to suppress evidence obtained pursuant to a search warrant. (Ex. GG.) Petitioner's car had been seized and searched pursuant to the warrant. The court ruled that the search warrant was voided and the fruits of the search excluded. (Ex. GG at 24-28; Ex. HH.) During the criminal trial, photographs of the exterior of Petitioner's car were admitted based on the parties' stipulation. (Ex. X at 12-13, 44-45, 102.)

On April 30, 2007, the trial court considered Petitioner's request for reconsideration of its previous ruling regarding the photographs. (Ex. II.) The court noted that the photographs were not present in the search warrant documentation, there was no evidence that the photographs were taken during the execution of the search warrant, and the photographs were not contemplated in Petitioner's previous motion to suppress. (*Id*.) The court concluded that voiding of the search warrant did not affect the admissibility of the photographs. (*Id*.) It further found that, even if Petitioner could show that the photographs were taken when the search warrant was executed, they would still be admissible because a defendant has no reasonable expectation of privacy in the identity of his vehicle and the photographs were admitted for identification purposes. The court concluded there was no violation of Petitioner's reasonable expectation of privacy, there was no search, and the Fourth

1  Amendment violation that led to the voiding of the search warrant and the suppression of

2  discovered items did not apply to the photographs.[5]  (*Id.*)

3      Petitioner asserted this claim in his supplemental post-conviction petition.  (Ex. N at

4  31.)   The PCR court rejected the claim, noting that it had previously ruled that the

5  photographs were admissible and had not been used improperly at trial, and defense counsel

6  had no basis for objection.  (Ex. P at 5; Ex. R at 2-3.)

7      Petitioner has not provided any verified information regarding the circumstances under

8  which the car was photographed.  Based on Petitioner's allegations in his supplemental PCR

9  petition and in his federal habeas petition, the car was parked in the driveway at his mother's

10  Tucson residence which was surrounded by a chain link fence.  According to Petitioner, as

11  one officer executed the search warrant another officer photographed the vehicle at the

12  residence and at the police station.  (Ex. N. at 32; Doc. 1 at 14.)  In any event, there is no

13  expectation of privacy in the exterior of a car because "[t]he exterior of a car, of course, is

14  thrust into the public eye, and thus to examine it does not constitute a search."  *New York v.*

15  *Class*, 475 U.S. 106, 107 (1986).  The act of photographing the car was not a seizure under

16  the Fourth Amendment because "[a] seizure of property occurs when there is some

17  meaningful interference with an individual's possessory interests in that property."  *United*

18  *States v. Karo*, 468 U.S. 705, 712-13 (1984) (internal citation omitted).

19      Most critically, the victim testified at the criminal trial that it was Petitioner's car that

20  was behind her when she was on the phone with Petitioner, describing the car as a "teal

21  Chrysler."  The victim's testimony, including her identification of Petitioner as the shooter,

22  linked Petitioner to the crime.  The victim described the car independent of the photographs

23

24      [5]   To the extent, if any, that Petitioner is asserting a Fourth Amendment violation
25  independent of his Sixth Amendment ineffective counsel claim, the claim fails because it is
   not cognizable on federal habeas corpus review.  *Stone v. Powell*, 428 U.S. 465, 494 (1976)
26  ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth
   Amendment claim, the Constitution does not require that a state prisoner be granted federal
27  habeas corpus relief on the ground that evidence obtained in an unconstitutional search or
28  seizure was introduced at trial.").

which were cumulative of her testimony. Thus, Petitioner was not prejudiced by counsel's failure to object to the admission of the photographs. This finding is buttressed by the fact that the trial judge ruled during the PCR proceeding that the photographs were admissible, thus, an objection by counsel would have been denied. *Cf. Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998) (noting that when the PCR judge, who also heard the trial, found the argument unpersuasive, ruling to the contrary "might at least approach a 'looking-glass exercise in folly.'") (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)). The state courts' denial of this claim was not objectively unreasonable. Claim Nine should be denied.

*Claim Ten: Trial Counsel's Agreement to a Trial Continuance*

Petitioner asserts that counsel provided deficient representation because he waived the speedy trial time limits as provided in Arizona Rule of Criminal Procedure 8 at a hearing on June 14, 2005. (Doc. 1 at 15.) Petitioner contends that counsel's waiver was solely for the benefit of the prosecutor. (*Id.* at 15-B.) On direct appeal, Petitioner argued that his due process rights were violated when the trial court denied his motion to dismiss based on a violation of Rule 8 and his speedy trial rights. (Ex. C at 45-53.) Petitioner's appellate argument clarifies that Petitioner obtained new counsel and waived certain time limits. (*Id.*) Counsel's response to a bar complaint filed against him by Petitioner states that any waiver of speedy trial rights was done with Petitioner's knowledge. (Ex. BB.)

Petitioner asserted this IAC claim in his supplemental PCR Petition. (Ex. N at 37.) The PCR court denied the claim, finding that defense counsel had stated in response to the bar complaint that counsel had informed Petitioner that "rushing to trial before his attorney had a chance to prepare would not be to his benefit" and that Petitioner was aware of the waiver. (Ex. P at 5; Ex. R. at 3; *see* Ex. BB.)

A defense counsel's representation to the trial court that he needs additional time to prepare for trial is not an act that falls below the standard of reasonableness. *See New York v. Hill*, 528 U.S. 110, 114-15 (2000) ("the lawyer has - and must have - full authority to manage the conduct of trial; . . . [s]cheduling matters are plainly among those for which

agreement by counsel generally controls").  Defense counsel's alleged agreement to a continuance because the prosecutor had a scheduling conflict does not support Petitioner's contention that defense counsel requested the continuance to benefit the prosecutor. (*See* Doc. 16 at 22 & Ex. C.)  Petitioner has not shown that had he proceeded to trial without the continuance there is a reasonable probability that the result of the proceeding would have been different.  Petitioner has not satisfied *Strickland*'s cause or prejudice prongs as to Claim Ten. The state courts' denial of this claim was not objectively unreasonable.

> *Claim Eleven: Trial Counsel's Failure to Object to the Detective's Testimony About the Victim's Out-of-Court Statements*

Petitioner argues that defense counsel failed to object to Detective Richards's trial testimony about statements the victim made to him while she was in the hospital, after the trial court had ruled the statements inadmissible.  (Doc. 1 at 16.)

The trial court ruled, pretrial, that statements the victim made to the police while she was hospitalized as a result of the shooting were not admissible.  (Ex. CC.)  However, Detective Richards testified at the criminal trial that the victim while in the hospital told him that  Petitioner had shot her, that she had been shot three times, and that it had happened on Valencia.  (Ex. X at 210-11.)  He also testified that the victim told him that she had seen Petitioner and that he had looked at her.  (*Id*. at 211-12.)  Defense counsel did not object to this testimony by the detective.

Petitioner asserted this claim in his supplemental PCR petition.  (Ex. N at 43.)  The PCR court ruled that precluded testimony was improperly presented to the jury and that it could not dismiss defense counsel's failure to object as trial strategy.  (Ex. P at 5-6.)  It further ruled, however, that the detective's testimony was merely cumulative of the victim's trial testimony, namely that Petitioner was the person who shot her, and that Petitioner had not shown that counsel's error was prejudicial.  (*Id*.; Ex. R at 3.)

A trial counsel's failure to object to evidence that is inadmissible under state law can constitute deficient performance, *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996); however, Petitioner fails to establish prejudice.  The detective's testimony regarding the victim's

1    statements was consistent with the trial testimony of the victim – she identified Petitioner as
2    the shooter, she had been shot three times (on her face, wrist and elbow), and she was
3    traveling down Valencia when the incident occurred. (Ex. X at 102-08.) Detective Richards
4    did not testify to any statement by the victim that was markedly different from her trial
5    testimony.  The detective's testimony, therefore, was merely cumulative of the victim's
6    testimony and counsel's failure to object did not infect the trial with prejudicial extraneous
7    evidence so as to deprive Petitioner of a fair trial. *See Delgadillo v. Woodford*, 527 F.3d 919,
8    930 n 4 (9th Cir. 2008) (ineffective assistance claim rejected on the merits where counsel
9    failed to object to cumulative testimony and Petitioner "fail[ed] to establish that but for the
10   admission of that testimony 'there was a reasonable probability that . . . the result of the
11   proceeding would have been different.'").  Similarly, Petitioner was not prejudiced, as he
12   suggests, by counsel's failure to ask the court to instruct the jury to disregard the detective's
13   testimony.

14        Petitioner's assertion in his federal habeas petition that he could have requested a
15   mistrial based on the presentation of inadmissible evidence (Doc. 1 at 16-A) is speculation.
16   In Arizona, "[a] declaration of a mistrial is the most dramatic remedy for trial error and should
17   be granted only when it appears that justice will be thwarted unless the jury is discharged and
18   a new trial granted." *State v. Adamson*, 665 P.2d 972, 984 (Ariz. 1983).  A mistrial generally
19   is not warranted based on the admission of cumulative testimony. *See State v. Dunlap*, 930
20   P.2d 518, 535 (Ariz. Ct. App. 1996).

21        Petitioner alternatively contends in his habeas petition that defense counsel could have
22   asked to have the victim's statements to other police officers, which he alleges was different
23   and would have undermined her credibility, admitted as a remedy for the detective's
24   inadmissible testimony.[6]  (Doc. 1 at 16-A.)  The victim's out-of-court statements to other
25   police officers also was hearsay and likely inadmissible under Arizona Rule of Evidence 801.

26

27        [6] Petitioner does not cite to a location in the record at which these interviews,
     conducted by Officers Glen and Wilder, can be found. (Doc. 1 at 16-A.) They do not appear
28   to be part of the Court's record.

1  *See Dunlap*, 930 P.2d at 535 ("We do not suggest that trial courts should balance a mistaken

2  admission of hearsay by extending equal hearsay opportunity to the other side.") (quoting

3  *AMERCO v. Shoen*, 907 P.2d 536, 550 (Ariz. Ct. App. 1995)).

4       In sum, Petitioner has not satisfied *Strickland*'s prejudice prong based on counsel's

5  failure to object to the detective's hearsay testimony. Denial of this claim was not objectively

6  unreasonable.

7                ***Petitioner's Request for an Evidentiary Hearing***

8       Petitioner requests an evidentiary hearing on the claims asserted in his habeas Petition.

9  (Doc. 1 at 18.) Review of § 2254(d) claims "is limited to the record that was before the state

10  court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398

11  (2011). All of Petitioner's claims alleged in the instant habeas petition were asserted in the

12  state courts and adjudicated on the merits. This Court likewise has found, and recommends,

13  that all of Petitioner's federal habeas claims should be denied on the merits. Where, as here,

14  "the record refutes the [habeas] applicant's factual allegations or otherwise precludes habeas

15  relief, a district court is not required to hold an evidentiary hearing." *Landrigan*, 550 U.S. at

16  474 (a hearing is not required if the allegations would not entitle the petitioner to relief under

17  § 2254(d)). Petitioner is not entitled to an evidentiary hearing.

18                      **RECOMMENDATION**

19       Claims One through Eleven fail on the merits. Based on the foregoing, the Magistrate

20  Judge recommends that the District Court dismiss the Petition for Writ of Habeas Corpus

21  (Doc. 1).

22       Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file

23  written objections within fourteen days of being served with a copy of the Report and

24  Recommendation. A party may respond to the other party's objections within fourteen days.

25  No reply brief shall be filed on objections unless leave is granted by the district court. If

26

27

28

1    objections are not timely filed, they may be deemed waived.  If objections are filed, the parties

2    should use the following case number: **CV-11-00199-TUC-AWT**.

3        DATED this 27th day of May, 2014.

D. Thomas Ferraro
United States Magistrate Judge